**CURRY, PEARSON & WOOTEN, PLC**
Attorneys at Law
814 W. Roosevelt
Phoenix, Arizona 85007
(602) 258-1000 Fax (602) 523-9000

Michael W. Pearson (mpearson@azlaw.com)
State Bar No.: 016281
Attorneys for Plaintiff

[Additional Plaintiff Attorneys on Signature Page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| GARY CARTER,<br><br>            Plaintiff,<br><br>      vs.<br><br>APP PHARMACEUTICALS, LLC; AMERISOURCEBERGEN DRUG CORPORATION; BAXTER HEALTHCARE CORPORATION; B. BRAUN MEDICAL, INC.; CARDINAL HEALTH 110, INC.; HOSPIRA WORLDWIDE, INC.; AND JOHN DOES 1 through 75 (fictitious),<br><br>            Defendants. | Case No.<br><br>**PLAINTIFF'S COMPLAINT AND JURY DEMAND** |

## JURY DEMAND

The plaintiff demands a trial by jury on all issues so triable.

## COMPLAINT

Plaintiff, Gary Carter, for his Complaint herein, alleges the following upon information and belief, except as to the allegations concerning individual circumstances, which are asserted upon personal knowledge.

**PARTIES**

1. Plaintiff, **GARY CARTER,** was at all relevant times herein, a citizen of the State of Arizona, residing in the city of Phoenix, located in Maricopa County.

2. Defendant, **APP PHARMACEUTICALS, LLC** (hereinafter referred to as "APP" or "Defendant"), has a principal place of business located at 1501 East Woodfield Road, Schaumburg, Illinois, 60173.  APP does business, including the marketing and sales of Heparin, in the State of Arizona.

3. Defendant, **AMERISOURCEBERGEN DRUG CORPORATION** (hereinafter referred to "AmerisourceBergen" or "Defendant"), has a principal place of business located at 1300 Morris Drive, Chesterbrook, Pennsylvania, 19087. AmerisourceBergen does business, including the marketing and sales of Heparin, in the State of Arizona.

4. Defendant, **BAXTER HEALTHCARE CORPORATION** (hereinafter referred to as "Baxter" or "Defendant"), has a principal place of business located at One Baxter Parkway, Deerfield, Illinois, 60015.  Baxter does business, including the marketing and sales of Heparin, in the State of Arizona.

5. Defendant, **B. BRAUN MEDICAL, INC.** (hereinafter referred to as "B. Braun" or "Defendant"), has a principal place of business located at 824 12th Ave., Bethlehem, Pennsylvania, 18018. B. Braun does business, including the marketing and sales of Heparin, in the State of Arizona.

6. Defendant, **CARDINAL HEALTH 101, INC.** (hereinafter referred to as "Cardinal Health" or "Defendant"), has a principal place of business located at 7000 Cardinal Place, Dublin, Ohio, 43017. Cardinal Health does business, including the marketing and sales of Heparin, in the State of Arizona.

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

7. Defendant, **HOSPIRA WORLDWIDE, INC**. (hereinafter referred to as "Hospira" or "Defendant"), has a principal place of business located at 275 North Field Drive, Lake Forest, Illinois, 60045. Hospira does business, including the marketing and sales of Heparin, in the State of Arizona.

8. Fictitious Defendants, **JOHN DOES 1 THROUGH 75,** are those persons, firms or corporations whose wrongful acts and conduct caused or contributed to the injuries sustained by Plaintiff, whose true and correct names are unknown to Plaintiff at this time, but who will be substituted by amendment when ascertained.

## JURISDICTION AND VENUE

9. Plaintiff alleges an amount in controversy in excess of $75,000.00, exclusive of interest and costs. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the Plaintiff and the Defendant.

10. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to these claims occurred within this District.

## STATEMENT OF FACTS

11. Heparin is used in preventing the formation of clots and extension of existing clots within the blood. Heparin is given parenterally – injected intravenously or subcutaneously. Because of its short biologic half-life of approximately one hour, Heparin must be given frequently or as a continuous infusion.

12. Defendants, APP, AmerisourceBergen, Baxter, B. Braun, Cardinal Health, Hospira, and John Does 1 through 75 (hereinafter collectively referred to as "Defendants"), separately manufactured, marketed, distributed, wholesaled, and/or sold several forms of Heparin throughout the United States, including the State of Arizona, and to St. Joseph's Hospital and

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

Medical Center, located in Phoenix, Arizona, even though each Defendant was aware of the risks of a serious side-effect associated with its product, known as Heparin-induced thrombocytopenia ("HIT").

13. HIT is a serious antibody mediated reaction resulting from irreversible aggregation of platelets. HIT develops from a patient's reaction to Heparin, resulting in the accumulation of "Heparin antibodies." HIT attacks platelets in the blood, and sometimes the lining of the blood vessels, and produces the opposite result from that for which Heparin is being used; it causes rather than prevents clotting.

14. On or around November 23, 2008, Mr. Carter was admitted to St. Joseph's Hospital and Medical Center due to a motor vehicle accident.

15. As part of his treatment at St. Joseph's Hospital and Medical Center, Mr. Carter received several doses of Heparin, beginning on or around November 23, 2008 and continuing to December 2, 2008.

16. Specifically, Mr. Carter was administered doses of Heparin including, but not limited to, one or more of the following products: Heparin 1000 units/ ml from a 10 ml vial on or around November 23, 2008; Heparin 2 units/ml from a 500 ml bag on or around November 23, 2008; Heparin 2 units/ml from two 500 ml bags on or around November 28, 2008; Heparin lock flush 100 units/ml from a 1 ml vial on or around December 1, 2008; Heparin 1000 units/ ml from two 10 ml vials on around December 1, 2008; Heparin 5000 units IV on or around December 1, 2008; and Heparin 2 units/ml from a 500 ml bag on or around December 1, 2008 continuing through December 2, 2008.

17. Each of the Heparin products administered to Mr. Carter caused and/or contributed to the cause of the injuries described herein.

4

18. Defendants separately manufactured, supplied, and/or sold one or more of the Heparin products administered to Mr. Carter.

19. Subsequent to and as a result of being administered the Heparin products manufactured by Defendants, Mr. Carter's platelet counts decreased dramatically from 297,000 on November 24, 2008, to 59,000 on December 3, 2008. An HIT antibody panel, which is utilized to confirm suspicions of HIT, was ordered and came back positive on December 2, 2008.

20. Subsequent to and as a result of being administered the Heparin products manufactured by Defendants, Mr. Carter developed and was diagnosed with HIT.

21. Subsequent to and as a result of being administered the Heparin products manufactured by Defendants, Mr. Carter developed multiple severe HIT related injuries including, but not limited to, gangrene, graft thrombosis, clotting of the blood, cyanosis of the extremities, and necrosis of the extremities.

22. Subsequent to and as a result of being administered the Heparin products manufactured by Defendants, Mr. Carter ultimately required an amputation of his left forearm.

23. Subsequent to undergoing the aforementioned amputations, Mr. Carter required prolonged rehabilitation.

24. As a direct and proximate result of the administration of Heparin manufactured by each of the Defendants, Mr. Carter was caused to suffer injuries to his health, strength and activity. He will continue to suffer physical and mental pain, all to his general damages, in a sum within the jurisdiction of this Court.

25. As a direct and proximate result of the administration of Heparin manufactured by Defendants, Mr. Carter was required to, and did, employ physicians to examine,

treat and care for him, and incurred, and will continue to incur, hospital, medical and incidental expenses in the future.

26. At all times relevant hereto, Defendants themselves, or through others, did manufacture, create, design, test, label, sterilize, package, supply, market, sell, advertise, or otherwise distribute Heparin.

27. At all times relevant hereto, the manufacture, creation, design, testing, labeling, packaging, marketing, sale or advertising by Defendants of their Heparin sought to create the image and impression that Heparin use was safe and had fewer side effects and adverse reactions than what was known by Defendants.

28. At all times mentioned herein, Defendants had a duty and obligation to disclose to Plaintiff and to his physicians the true facts concerning Heparin: that carefully monitored testing must occur before and follow after the administration of Heparin and the proper protocol for that testing including, but not limited to, monitoring platelet counts more stringently than currently instructed; that a Heparin history must be obtained prior to the use of Heparin, and warning that the risk of developing HIT is as its highest between 5 and 120 days after the initial administration of Heparin; and that use would cause serious injuries, including HIT.

29. Prior to Heparin being administered to Mr. Carter, information was available to each of the Defendants with respect to the defects and dangerous nature of the drug. Prior to the administration of Heparin to Mr. Carter, it was known to each of the Defendants, or they had reason to know or should have known, of the increased risk of HIT associated with the Heparin.

30. Defendants purposefully minimized and understated health hazards and risks associated with Heparin. Defendants, through their literature, packaging and labeling deceived potential users of Heparin by conveying certain information while omitting other information to

suggest widespread acceptability, while downplaying the known adverse and serious health effects of the drug. Defendants withheld relevant information from potential Heparin users, including Mr. Carter. Further, Defendants withheld relevant information from physicians who administer Heparin, including Mr. Carter's physicians, thereby preventing those physicians from conducting a complete and fully-informed risk-benefit analysis before administering Heparin, or taking appropriate steps to monitor the administration of Heparin to prevent serious adverse events.

31. Mr. Carter's physicians relied on the representations of Defendants about Heparin prior to the date of administering Heparin for use.

32. Prior to the date upon which Heparin was administered to Mr. Carter, Defendants knew or should have known that it was extremely dangerous and unsafe for use by the general public for its intended purpose. Defendants failed to take appropriate action to cure these defects or, alternatively, failed to appropriately warn of the product's dangerous characteristics.

33. Plaintiffs are informed and believe that the Heparin was defective and, on that basis, herein allege that Defendants distributed a defective product which resulted in Mr. Carter's injuries.

34. Plaintiffs are informed and believe, and on that basis, herein allege, that Defendants did not utilize due care in the manufacture of Heparin. In addition, Plaintiffs are informed and believe, and on that basis, herein allege that Defendants either knowingly or negligently designed, manufactured, fabricated, packaged, labeled, marketed, distributed, and/or sold defective Heparin.

35. Mr. Carter was exposed to the defective Heparin designed, manufactured, fabricated, packaged, labeled, marketed, distributed and sold by Defendants. As a result of his

exposure to said Heparin, Mr. Carter suffered serious injury and now demands relief as requested below.

36. Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences. Accordingly, additional damages for the sake of example and for the purpose of punishing the Defendants for their conduct, and in an amount sufficiently large to be an example to others and to deter these Defendants and others from engaging in similar conduct in the future, is appropriate. Defendants' wrongful conduct was done with the advance knowledge, authorization, and/or ratification of officers, directors, and/or managing agents of Defendants.

## COUNT I

### (Strict Liability/Failure to Warn)

37. Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

38. At all times herein mentioned, Heparin was defective and not fit, suitable and safe in that it was not accompanied by proper warnings regarding known or knowable risks of harm associated with the drug.

39. Additionally, at all times herein mentioned, Heparin was defective due to the inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risks of injury from Heparin, they failed to promptly respond to and warn about the likelihood of injury.

40. The reasonably foreseeable use of the product, i.e., administration to prevent the formation of clots and extension of existing clots within the blood, involved substantial dangers not readily recognizable by the ordinary user of the product.

41. Defendants further breached their duty to warn, in that the types of injuries caused by Heparin are not generally known. Nor did Plaintiff Gary Carter have actual knowledge of the dangers prior to the administration of the drug.

42. As a direct and proximate result of Defendants' failure to warn Plaintiff of the dangers of Heparin, Plaintiff was caused to suffer the herein described injuries and damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT II

### (Strict Liability/Design Defect)

43. Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

44. The Heparin manufactured and supplied by Defendants was placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition in that the foreseeable risks exceeded the benefits associated with the design or formulation.

45. Alternatively, the Heparin manufactured and supplied by Defendants was defective in design or formulation in that when it was placed in the stream of commerce it was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

46. The Heparin manufactured and supplied by Defendants was defective due to inadequate warnings or instructions because the Defendants knew or should have known that the product created a risk of harm to consumers and Defendants failed to adequately warn of said risks.

47. The Heparin manufactured and supplied by Defendants was defective due to inadequate warning and inadequate testing.

48. The Heparin manufactured and supplied by Defendants was defective due to inadequate post-marketing warning or instruction because after the Defendants knew or should have known of the risk of injury for Heparin, they failed to provide adequate warnings to users or consumers of the product and continued to promote the product.

49. As a proximate and legal result of the defective and unreasonably dangerous condition of these products manufactured and supplied by Defendants, Plaintiff was caused to suffer the herein described injuries and damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT III

### (Negligence)

50. Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

51. At all times herein mentioned, Defendants had a duty to properly manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, prepare for use, and sell the aforementioned product.

52. At all times herein mentioned, Defendants knew, or in the exercise of reasonable care, should have known, that the aforesaid product was of such a nature that if it was not properly manufactured, compounded, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared, and provided with proper warnings, it was likely to injure the product's user.

53. Defendants so negligently and carelessly manufactured, compounded, tested, failed to test, inspected, failed to inspect, packaged, labeled, distributed, recommended, displayed,

sold, examined, failed to examine, over promoted, and supplied the aforesaid products, that it was dangerous and unsafe for the use and purpose for which it was intended.

54. Defendants were aware of the probable consequences of the aforesaid conduct. Despite that fact that Defendants knew, or should have known that Heparin caused serious injuries, they failed to disclose the known or knowable risks associated with the product as set forth above. Defendants willfully and deliberately failed to avoid those consequences, and in doing so, Defendants acted with a conscious disregard of the safety of Mr. Carter.

55. As a result of the carelessness and negligence of Defendants, the administration of the aforesaid product caused Plaintiff to thereby sustain the damages and injuries as herein alleged.

**WHEREFORE**, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT IV

### (Breach of Implied Warranty)

56. Plaintiffs reallege all prior paragraphs of the Complaint as if set out here in full.

57. At all times mentioned herein, Defendants manufactured, compounded, packaged, labeled, distributed, marketed, examined, supplied, prepared, and sold Heparin, and prior to the time it was administered to Mr. Carter, Defendants impliedly warranted to Mr. Carter, and his physicians, that the product was of merchantable quality and safe for the use for which it was intended.

58. Mr. Carter and his physicians relied on the skill and judgment of Defendants in using the aforesaid product.

11

59. The product was unsafe for its intended use and it was not of merchantable quality as warranted by Defendants in that it had very dangerous propensities when put to its intended use and would cause severe injury to the user. The aforesaid product was unaccompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution. The aforesaid product did cause Plaintiff to sustain damages and injuries as herein alleged.

**WHEREFORE**, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT V

### (Breach of Express Warranty)

60. Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

61. The aforementioned manufacturing, compounding, packaging, designing, distributing, testing, constructing, fabricating, analyzing, recommending, merchandising, advertising, promoting, supplying and selling of the aforesaid product was expressly warranted to be safe for use by Mr. Carter and other members of the general public.

62. At the time of making of the express warranties, Defendants had knowledge of the purpose for which the aforesaid product was to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose. The aforesaid product was unaccompanied by warnings of its dangerous propensities that were either known or knowable at the time of distribution.

63. Mr. Carter and his physicians reasonably relied upon the skill and judgment of Defendants and upon said express warranty in using the aforesaid product. The warranty and representations were untrue in that the product caused severe injury to Plaintiff and was unsafe and,

therefore, unsuited for the use for which it was intended. The aforesaid product could and did thereby cause Plaintiff to sustain damages and injuries as herein alleged.

**WHEREFORE**, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

DATED this 29th day of November, 2010.

                        Curry, Pearson, & Wooten, PLC

                        /S/ Michael W. Pearson
                        Michael W. Pearson
                        814 West Roosevelt Street
                        Phoenix, Arizona 85007
                        Tel: (602)258-1000
                        Fax: (602)523-9000

Daniel R. Lapinski
*(To be admitted Pro Hac Vice)*
Philip A. Tortoreti
*(To be admitted Pro Hac Vice)*
Lynne M. Kizis
*(To be admitted Pro Hac Vice)*
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive
Woodbridge, New Jersey 07095

Frances Tomes
*(To be admitted Pro Hac Vice)*
THE TOMES LAW FIRM
150 B Tices Lane
East Brunswick, New Jersey 08816

Neal Lewis
*(To be admitted Pro Hac Vice)*
NEAL LEWIS & ASSOCIATES
9487 West State Street
Orland, Indiana 46776

*Attorneys for Plaintiff Gary Carter*